18-9560 for Petitioner Ms. Hong. Good morning. My name is Kari Hong and I represent Petitioner Joaquim Addo. The BIA agreed that Mr. Addo had experienced past persecution. Starting in 2012, the Akwaude tribe beat up Mr. Addo, set his house on fire, tried to kill him, they beat up his brothers, attacked his wife, tried to kill his father, and successfully assassinated his uncle. The government said he's no longer in danger because in 2003, a report showed that the Akwaude tribe controls a part of the country that is 190 square kilometers, which is approximately 118 miles. The problem is the past persecution occurred outside of this area that the Akwaude tribe controls. After the first attack against him, Mr. Addo fled Nkwanta and never returned. Fleeing that area did not stop the five-year campaign of violence against him and his family. The tribe traveled 227 miles from Nkwanta to Accra to beat him up, attack his wife, and try to kill Mr. Addo and his family. The tribe sent text messages promising to find Mr. Addo wherever he went, and when he moved residences within Accra, they found him. This legal error then is the same one that was in Thiem's Beholder. There, the DHS tried to rebut the well-founded fear with a citation to a general country condition report, and this court held that the general report was insufficient because it, quote, fails to address Thiem's particular circumstances, unquote. Turning back to Mr. Addo, the BIA erred because the DHS produced no individualized evidence that it is safe for Mr. Addo to live anywhere in Ghana. The tribe still has a motive to harm him. The tribe leaves that 190-kilometer area, and in fact, the attacks from 2012 to 2017 occurred outside of that area of control. The DHS also produced no evidence that it's reasonable for Mr. Addo to live anywhere in Ghana. His wife, children, brothers have fled the country. He cannot reasonably live without his family, and the BIA also erred in conditioning his safety on surrendering his claim to be chief of the tribe, which is in the area of control by the Akude tribe. Now, second, the government said that the Akude tribe is no longer interested in harming him because he relinquished his status as heir to the chieftain. But he relinquished that status in 2012. That's at AR 398. For five years after that fact, the tribe kept seeking to harm him out of belief he would nonetheless still be his father's successor to lead his tribe. So if there are no further questions, may I reserve the rest of my time? I better ask you a few questions before you reserve. So just looking at the record, it seems like the threats and attacks against Mr. Addo have occurred in a discrete part of Ghana. And what does the record say about... I mean, it seems like the majority of the country is outside of this area that you've identified. What does the record say about that? Your Honor, the actual map of the area of control is at AR 111. And it's a small section on the eastern side of the country. Nkwanta, the hometown where he lived, is inside. That is where he was attacked in 2012. That's where his father was attempted to be assassinated. That's where the police arrested the persecutors, and then they were bribed, and they ended the criminal proceedings. That happened inside of that area. 200 miles away is Accra. Accra is the capital. It's a busy, urban, diverse area. It is outside of that area. And over 200 miles away, for five years, the tribe tracked him down. When he tried to live within and move around, they still tracked him down. They sent him a text message. And I would submit that under matter of MZMR, the BIA itself makes it very clear that reasonable relocation is not met when he's only one step away from his persecutors. He was always one step away from his persecutors in Accra. Right. So I agree. I understand that. But the record about Accra also was that in addition to his home, that the capital, Accra, which is the capital city as I understand it, is basically the only other place in the country with a concentration of his opposing tribe. No, Your Honor. Accra actually is a diverse city that's well, 200 miles away from. I understand that. But doesn't the record state that it's got sort of a, it's another stronghold of his, of the Atwodi tribal members? Your Honor, I don't believe so, because at 111, it's only showing that there's an area from the 2003 report, that area of the jurisdiction that the tribe excludes, that it controls. There are over 200 tribes in Ghana, and there's no showing that they control any other side outside of that area. Accra is presumably not controlled by any tribe, and he wasn't safe there. Oh, no. So I'm not saying he's controlling it. My question is, I thought the record was that you have the one area where there's control, and then in the capital city, which is admittedly diverse, it's sort of the second stronghold of his competing tribe, for lack of a better term. Your Honor, I don't believe there's any evidence showing that that's the stronghold of the tribe. That's where they attacked him. I think we're passing each other with my language. So Accra, as I understand it, is another place in the country that has a substantial number of members of the Atwodi tribe, as I understand from the record, in addition to his homeland. Your Honor, and his credible testimony said that the tribe members are everywhere, including at the airport. And I think this question is important because the government has not shown that the tribe is actually limited to any part of the country. There's free movement in that country where they can locate him anywhere. And under MZMR, for an applicant to internally relocate safely, there must be an area of the country where the government can show that he has no well-founded fear of persecution. The government has not identified any part of Ghana where the tribe won't be. They said because they control this one area, there must be an inference that they don't have any control in the rest of the country. But that is completely refuted by the fact that they went and tracked him down 200 miles in Accra. They tracked him down when he moved within Accra. And they sent him a text message that the IJNBI found credible that said, we will hunt you down wherever you go. Right. Okay. So I'm sure that I understand your position. What is the legal basis for reversal? Is it lack of substantial evidence? Is it a misapplication of burden of proof? Your Honor, that's a great question. I would submit there are two different standards that the court can choose. In the Thiem case, the court chose the substantial evidence where they said simply because the BIA or the agency failed to account for the other evidence in the record that Mr. Thiem was in danger, that reversal was warranted. And I would say that's the evidence here. The fact that the BIA did not account for the fact that the persecution occurred outside of this area of control is sufficient. The Karki case by the Tenth Circuit also has found the disregard of evidence to be a legal error. So whether this court decides it's a substantial evidence standard or a disregard of the evidence under Karki, I would submit both situations are met under this record. What do you make of the view that he's qualified to work as a crew member in a port? And the way I understand it, the agency is saying, so go get a job in a port and nobody will pursue you there. Your age, your health, so forth, factor in favor of. Yes, and Your Honor, the test is twofold. One, is it reasonable? Can he be safe anywhere? And second, is it reasonable? And the agency or the DHS has to meet both. On the safety, as I'd argued before, there's no showing that he's safe anywhere, even in this port. That's an assumption, but there's no individualized proof that the tribe would never find him. But then on the question of reasonableness, what we have here is that his family is not with him. They are outside of the country because they have been attacked by these gang members. And second of all, it's not reasonable because if he wants to be chief, he has to leave that area of control. And it's very clear that the agency cannot grant or not find the lack or cannot condition someone's safety on the condition that they forego their claim to be a chief of the tribe. It's not any job. It's not Social Security where he can find any comparable job. He's not allowed to be heir to the chief. That is not disputed, and that makes it unreasonable as a relocation matter. Is that even still on the table, though? I thought he'd renounced his ability to be the chief. Well, again, Your Honor, he renounced it in order to be safe, and his father said, yes, you should renounce it as much as this is part of our family because I can't keep you safe, and you will not be safe. But again, that shows if the only way for him to be safe is to renounce his claim, that's not true safety.  You can go back to your country as long as you never pray again. We would recognize that as a clear error, that that's not a true grant of safety. But what if the alien had changed religions? That's the point here. That's what Judge Carson is saying. Isn't it irrelevant that he wouldn't be safe if he continued to claim heirship, but he's renounced heirship? And, Your Honor, to fight that hypothetical, the facts on this case are that even after he renounced it, he was persecuted for five years because they perceived him to still be in line and succession still be a threat to them and to their power. So he can't unring the bell. He cannot disassociate himself from their belief that he is a threat to their power. I gather there was no evidence presented that once he renounces, he can't unrenounce first and second, that his pursuers would have to necessarily believe that. Yes, Your Honor, that was actually never litigated below. That was never raised below. But again, the fact that he was persecuted for five years, accumulating with a bullet going through the window of his house, shows that the renunciation meant nothing to his persecutors. Thank you, Ken. You wish to reserve the extra, the remaining time? Yes, Your Honor. Thank you. Mr. Stewart. Thank you, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the Attorney General. In this case, the agency concluded that the Department of Homeland Security established that it was possible and reasonable for Petitioner Joaquim Otto to relocate within Ghana to avoid persecution. The agency therefore denied asylum and withholding protection. This Court should deny Mr. Otto's petition for review. The agency's factual determination regarding internal relocation was reasonable and supported. It cannot be disturbed. Petitioner's remaining legal challenge, which my friend has not raised in her opening, is also, as we've explained in our 20HA letter, foreclosed by more recent precedent of this Court. I'd like to focus on a point that I think Judge Carson was homing in on, Your Honors, and that's that the agencies here both reasonably found that although Mr. Otto presented evidence of past persecution that was accepted, acknowledged, that's the premise the agency worked from after the BIA's initial remand, and it recognized the extent of that violence, the violence, the attacks, the persecution that he faced was localized to the traditional tribal area of his persecutor tribe, the Ebodi, with some infiltration into the sizable capital city of Accra in Ghana. And the agency reasoned in light of those facts and significant other facts that relocation, given the highly localized nature of the persecution, was in this instance reasonable, and the Department showed that it was reasonable. What do you mean highly localized? How can you distinguish Accra from anywhere else in the country? Why, if they can find him in Accra and persecute him, doesn't that suggest that they could go anywhere else? There's nothing distinctive about Accra in that respect, is there? Well, I think Accra, it is the capital, Your Honor, and it has quite a sizable population. I think perhaps unsurprising that even a localized tribe could end up having some presence or some infiltration into such a large capital city. I believe the record shows, Your Honor, that the population of Ghana as a whole, it's variously put around 27.5 to 28.5 million. It says that Accra, this is page 99 of the excerpt of record, is, I believe, about 2.277 million. So you'd expect some larger numbers and maybe some broader representation in that kind of a larger city, Your Honor. But there's no showing here that this very, very small Otwode tribe, 15,000 members in 2003, about 15,000 members later on in the record, is what we see here. Well, in your brief, you say that Kumasi would be a safe city. How do you distinguish Kumasi from Accra? I think what we're saying is that there's nothing to show, and Mr. Otto indeed himself acknowledged that the Otwode does not control the country. They don't hold sway throughout the entirety of Ghana, which is not the biggest of countries, but it's sizable. As I said, it's quite populous. There are decent distances. So there is some infiltration in Accra, but the petitioner didn't present anything to show that there was infiltration anywhere else. It's a little bit like— Isn't that a fallacy? Isn't that a fallacy? What you're saying is the only place that he can be injured is a place where the rival tribe has sway, that all it takes is one member of the rival tribe to injure him. In other words, he's not being pursued because he happens to be in a certain place. He's being pursued because of who he is. Your Honor, I think what internal relocation is getting at, though, is whether the persecutors have sweeping sway throughout the country. So you can imagine a different situation where the persecutors are, say, the national government that governs the country writ large. You can imagine it being a harder case to relocate if the government kind of has an omnipresence everywhere. What the agency was saying here, however, is that, look, this is a—he faces past persecution. He's faced past persecution by a very, very small tribe in a quite large ethnically heterogeneous country. He has sisters who are still in Accra. He's been attacked only in Accra, though he has, in addition to Nkwanta, he hasn't faced violence in other places. The influence of this tribe— Where else has he been besides the home area in Accra? Where was he not? I think those are the only two areas we kind of have in the country we sort of have discussion on, Your Honor. I think he was in Nkwanta, and then he moved to Accra and said that he moved in different places in Accra. But his enemies don't hold sway in Accra, and they found him. So the question is, you've got some facts here. You've got facts that even in a place a couple hundred miles from where they hold sway, they pursued him with some vigor. And then you say, but there's no reason to think that they wouldn't go elsewhere. I think that's not a very convincing argument there. Your Honor, I think the agency did home in on the relevant facts, and it did make a decision which was in the bounds of permissible inferences based on the evidence. I mean, again, Your Honor, we're talking about a 15,000-member strong tribe, a country that has meaningful size, meaningful population. He moved only to this large urban center after initially being in kind of the area where the kind of hot spot of the land is skewed and the harm was. And he was pursued in Accra, but he did not move to other areas of the country. The board noted that. It noted the relative size of the country. A lot of these points are at page 54 of the record, Your Honor, where I think the agency did a good job to say, look, he relocated only in neighborhoods in Accra. You know, he testified that this tribe is not so powerful that it controls the entirety of the country. That's quite sensible and reasonable given how small the tribe is relative to Ghana's size and population as a whole. He is away from the land dispute. He has given his apparent status of not being the heir apparent. It does provide some dissipation from the risks that he previously faced. The comment that my friend observed about the airports was, as the agency deemed it, speculation. And the agency really emphasized here, this is not a major tribe. Again, it's similar. This is not like the national government. It's not one of the bigger tribes. This is a very. Let me just cut in. Let me just cut in because I don't think you're addressing our question and our point. And maybe a different way of asking it is this. Do you think that the agency contends and that it contended during the hearings that Mr. Otto would be safe if you were somewhere other than those two locations and the rival tribe knew his exact address at those other places? I'm not sure what to say about exactly. I mean, I think.  No, Your Honor. In other words, if he is shot at a different place, he doesn't take comfort that the rival tribe didn't hold sway there. He's just as dead. Your Honor, the same thing could be said about him living in this country. If the rival tribe found out his exact location and they were committing to killing him, there's a reason we would not think that he faces the same risk. And that's because there's a distance apart. The commitment to find him could only reasonably be thought to extend so far. So moving somewhere somewhere far away from these two areas in one of the many other areas in Ghana was reasonable in this circumstance. So the agency's position is they won't find him. I'm not sure that that that issue's been broached, Your Honor. I don't know that it's kind of been pinned down, you know, what that would look like. I want to be careful about not doing, you know, getting into something the agency didn't kind of. When you say when you say it could move far away. But by the way, you have the burden. The government has the burden on this issue. That's right, Your Honor. You say he could move far away. Certainly the United States is far away. How much further away from his homeland could he be in some country than Accra? I'm not sure exactly of the dimensions of all that, Your Honor. But I think our maps do show that, look, the Nkwanta region is on the east. Accra is kind of, you know, is sort of similarly on that in the eastern part of the country. Their, you know, regions, basically the inference from the agency is that, look, when you have a localized dispute by this from a small tribe that holds, you know, sway and with some spillover in some very confined areas, you have safe parts in the other part of the country. This is not a government persecutor situation. How much further away is Kumasi than Accra? Like 100 miles or something? I apologize, Your Honor. I'm not sure. I'm not sure of that information. There might be some differences, but they're not qualitative. I'm not sure about that, Your Honor. Again, I think, you know, again, if he's outside of Nkwanta, that's, of course, qualitative. Accra, I think, is different in kind. I mean, it is the capital city and highly populated. You know, he has other families there. Kumasi has a greater population, does it not, than Accra? I need to check on that, Your Honor. But my point is more about the capital city. It's not surprising that a capital city kind of in the same kind of portion of the country would have, you know, some folks from that tribe who could reach it. But again, Your Honor, I think the nature of the colloquy we're kind of having here, I think, does underscore that this is a factual question. It is a substantial evidence question. And the agency really did look at, hey, you know, internal relocation, how do you show it? You can show here the localized nature of the persecution, the localized nature of the violence, that it's really about a piece of land and that the limited numbers of potential persecutors, those features together along with other features such as giving up his status to succeed as chief, his sister still living in the country. Let me ask, try to understand the test better. Would the government have to show that it would be unreasonable for him to believe that he's unsafe everywhere in the country? Or is it an objective standard of whether he's safe? I believe it's objective, Your Honor, because we're talking about a rebuttal of a well-founded fear of future persecution, which itself is about. And I think so. I think it's about what the evidence in its totality shows could objectively be done regarding relocation. So I was wondering if the test might be whether he would still have a well-founded fear of persecution anywhere in the country. You don't have to rebut that. You can say he as a one, you know, he would have a well-founded fear based on past persecution. But the chances of persecution everywhere in the country are so small that we have rebutted his claim. I think it's something more along those lines, Your Honor, where it's at this stage of the inquiry, we're taking as a given that he does have a well-founded fear of persecution. And the question is whether he can just go somewhere else where he's likely enough to be safe and where he could reasonably do that. And what we're saying here is that that's a heavily fact-bound inquiry. It is one of these things where, you know, you kind of look at it in the abstract. How would the government prove this? How do they kind of prove the negative? And here, you know, a key way to do it, Your Honor, is to show the limited localized nature of the persecution, of the harm, of the violence. And the agencies were well within their reasonable fact-finding in concluding that this was quite a localized dispute. They acknowledged the spillover into Accra. They, you know, obviously the agency really recognized and appreciated the nature of the harms here. But it looked at just the numbers, the geography, just all the other, you know, features that really bore on this and reached that reasonable conclusion. So I think that's what we're looking at, Your Honor, is a classic factual question where the agency fell within the bounds of reasons. And the record just doesn't compel a different result here. Well, so let me jump in here for a minute before you run out of time. Because the IJ, one thing I noted was the IJ said there was no evidence that the Ethiopians were willing, capable, and inclined to persecute Addo throughout Ghana. It seems to me that the IJ may have flipped the burden here. I mean, shouldn't the IJ have been finding that you prove that he could live without being pursued in Ghana as opposed to finding that there was no evidence that they were going to pursue him? You're right on the burden, Your Honor. I would say two things. I'd say a few lines up, and this is on page 53 of the record, the IJ correctly did identify that DHS has the burden. And then I would say, Your Honor, in that analysis from pages 53 to 54, the IJ properly applied that burden. I think it was just emphasizing, Your Honor, at the outset, look, you know, he doesn't have any evidence that these folks pervade Ghana and are going to persecute everywhere. But the much longer analysis is the analysis that appears on 54, Your Honor, where the court really analyzes the geography, numbers, other factors. That's how it reached its reasonable conclusion. I see my time is up, Your Honor, but I ask the court to deny the petition. Well, are there any further questions? Judge Carson? Judge Phillips? None, thank you. Thank you, counsel. Thank you, Your Honor. A couple minutes left, as I recall. Thank you, Your Honor. I have two points. First, under the law, when he finds past persecution, which everyone agrees he did, there is a legal presumption he is in danger everywhere. The DHS can rebut that presumption, but to do so under Theum and under MZMR, it can do so only when providing individualized evidence that there is an actual place. In Arevalo Lara, this court found that the government did successfully rebut a presumption when the woman there lived in a city away from her initial persecution for a year in safety without any harm coming to her. In this record, we do not have that situation. We do have that situation. He fled as soon as the bullet went through his bedroom, narrowly killing him. And here we have Ghana being the size of the state of Michigan. The tribe found him 200 miles away from the first incidents where they tried to harm him. And unlike any other case, we have credible evidence of a text where the tribe members said, we will hunt you down. And they followed through on that text by locating him in Accra and within Accra when he moved. Counsel, let me ask you one thing. So we have sort of a non-exhaustive list of factors from that Theum case about when someone might reasonably relocate within a country. And in this case, it seemed to me that the BIA basically acknowledged those factors and said that it would be reasonable but didn't really have any individualized discussion of most of them. Is it enough for the BIA to just say, look, I'm aware of these factors and I'm considering them? Or is it your position that they have to have a more in-depth analysis of how the factors work? Your Honor, the regulations that are articulated themselves say that some might not be relevant to the case at hand at all. So the agency doesn't have to consider all of them, doesn't have to apply all of them. But they have to consider what is relevant. And what the test is a twofold test. Is it, can he safely relocate and is it reasonable for him to do so? The agency skipped over that safely. And the evidence is showing that there is no one location where he can safely relocate. The court need not reach the reasonable inquiry. If it does, then it can deal with those other factors. They said, you know, he can find a job anywhere because he's healthy. Against that is the family situation, which is what the other cases have found to be very compelling ones and the cheap them. But again, on safety alone, this record has uncontested facts showing he's not safe anywhere in the country. Let me follow up on the reasonableness component there. Putting those two factors together would be enough. Well, let's put it this way. Would the government have to rebut the proposition that he could reasonably fear and did reasonably fear being persecuted anywhere in the country? In other words, is there a subjective component to the question of danger everywhere in the country? Maybe we would say, yeah, he's probably safe some places in the country. But after the text and everything that had happened to him, he would say, I reasonably fear that I can't be safe in this country. Is there a reasonableness component to the government's response to the reasonable fear that's been established by the past persecution? Your Honor, I would submit that it's an objective test, which the credible evidence of the text. I'm sorry, did you say objective or subjective? Objective, objective tests. But Thiem is an interesting case. Because there in Thiem, they provided expert evidence. The DHS had expert evidence showing that there, the man could reasonably safely relocate to another part of the country. The Tenth Circuit nonetheless reversed it because it wasn't reasonable. Because even though he could live in another part, he couldn't be with his family. And there, the Tenth Circuit said the reasonableness enough can even undercut the fact that there was expert testimony that there he was safe. Mr. Otto has no showing that he's safe anywhere in the country. Thank you. Thank you, counsel. Case is submitted and counsel are excused.